Case is E8 PHARMACEUTICALS and MIT v. AFFYMETRIX and NAVAGENICS, 2013-10-46, Mr. Weiss. Good afternoon. May it please the court, the key focus of this appeal is the construction of the claim term, randomly primed PCR-derived RCG. This is an issue that this court reviews de novo based on the intrinsic record. In this case, the district court got it wrong and should be reversed based on two fundamental principles of claim construction. First, the inventors can be their own lexicographer and provide a special definition of a term, either reads out disclosed examples and embodiments is rarely, if ever, correct. With respect to the first... We haven't said that where claims have been narrowed during prosecution. We haven't said that when claims have been narrowed during prosecution. Right, but in this case, Your Honor, the claims have not been narrowed. During prosecution, the inventors... Where did the patentee act as its own lexicographer with respect to this claim term? Certainly during the prosecution history when it pointed back to the definition that appears at column 12, line 45. But I don't see the definition appearing in that portion of the specification. Could you read it? It appears at column 12, line 45, and it reads as follows. The PCR-generated RCGs are randomly primed. That is, and that's a signal from the, if you remember the Skin Medica case very recently, that is a signal of the definition that each of the polynucleotide fragments in the RCG have common sequences at the ends of the fragments, but with the Why is that a definition that supports what you're doing? I mean, it is when you can have a randomly primed situation where there is identity in the nucleotides, right? I mean, if they were chosen randomly, they can still be identical. The fundamental distinction, Your Honor, is what I say correct? If, as in our case, the primers randomly prime the genome, the DNA molecule at randomly distributed locations across it, you will generate a set, a reproducible subset of fragments that all have the same sequence at the ends, but not in the middle. So they can be randomly primed and still be identical, correct? Not under what the inventors teach. There is the other technique is the locus-specific technique where you take two primers. No, no, I understand what that is, but if they're randomly selected, you're still replicating them and the ends are identical, right? I think the confusion is the composition of the primer versus priming of the genome. No, I'm not confused. I know what the there will be millions of fragments that have the same sequence at the end and the same sequence in the middle, along with another 100,000 or so that are like that. Yes, you do amplify up more, so that when you come to testing, you can test them with the existing techniques. That was one of the fundamental teachings of the patent. I want to try to understand. I was kind of surprised when I got to your reply brief, because I was with you on the blue brief that you were saying, look, we were our own lexicographer. We came up with a special kind of definition, and here it is. And the red brief then says, well, they essentially conceded that it wasn't the ordinary customary meaning of the term, that they came up with their own version. And in your reply brief, you said, no, no, we don't concede that. So are you saying that you were your own lexicographer and you came up with a definition that might differ from that of what one in skilling art would otherwise assume was meant, or are you saying somehow that you came up with your own definition and it just so happens that it's also consistent with the ordinary meaning of that term? Let me try to be clear. We came up, during the prosecution, we said there is a definition of column 12 that we're incorporating into the claim language that is a structural definition based on the ends of the fragments and differences in the middle. And that's the way we defined it. Affymetrix argued and said, oh, there's a well-understood meaning to the term randomly primed. We disagree. There is no factual finding on that. The only expert testimony I saw was the expert testimony from their expert, Dr. Kwok, who specifically defined what he thought the ordinary and customary meaning would be to one of skill and the art, and you didn't put any contrary testimony into that effect. Well, we didn't because what he said is, and it's not their definition, it is not the definition the district court did. What he said is, in this case, I agree. The inventors came up with a special definition based on the ends of the fragments and the structure of those fragments. He admitted it. So you concede, though, that you didn't put in a testimony that said that one of ordinary skill and the art would read your definition, special or not, to be consistent with what one of ordinary skill and the art would otherwise understand. There was no extrinsic evidence at all. Our definition is based on the intrinsic evidence during the prosecution history, the inventors at page A965, using the word definition five times, saying we're picking up that definition and we're incorporating it into the claims and we're using that definition to distinguish the locus. So as a result, your argument is entirely dependent upon our conclusion that that is a specialized definition in the specification, and I guess you say elsewhere in the prosecution history, that we're bound by or everyone would be bound by because everyone would understand it. Yes, because back at this time, there was no general definition of the concept of randomly primed. There's nothing in the record that suggests that. Well, they had expert testimony that suggested that. But it's not their definition. What he said is, oh, back to this 2005, what I think that means is it's got a bunch of these N's in it. That's not their definition. And what he conceded was, you know, if I was sitting here, that's sort of what I would come up with. But the inventors, column 12, line 45, have come up with an express definition, and I, as one skill in the art, reading that, understand that to be an express definition. And I think the district court here, you know, in teaching randomly primed PCR, Where does that definition say that it's not random? That the primer is not random? It doesn't. It says... No, it doesn't say that. That's the problem. Right, but it says it has four embodiments. There's the IRS, the adapter, the AP, and the DOP PCR, all of which are given as alternative embodiments, all of which will, in the specifications, Well, I agree on that, but the question is whether that was overcome by adopting a definition that is more limiting during the prosecution. Well, I might respond, Your Honor, by saying that all four of those methods, when applied, will generate subsets of fragments that meet the structural definition. Whether the primer has arbitrary nucleotides in it, or whether it's precisely defined, it will generate a set of fragments that satisfy the structural definition of Periodic Claim 12. And that's what the inventors told the examiner during prosecution. The examiner said, Gee, the words PCR derived, RCG, standing alone, might read on locus specific. And we said, No, no, no. We will disclaim that. We are not reading on locus specific. But all of the embodiments that we teach, all will generate something that meets the structural definition. And that's one problem with the district court's construction. By reading in, by taking a characteristic that appears in two of the embodiments, but not the other two, making it into a claim limitation, reading it into the claims, he has basically excluded two of the, or all of the IRS examples and the entire adapter PCR involvement. I think, you know, again, I focused you on A-965, which is the critical distinction where they talked about the NEF issue and bring it in. This is one of the problems we had is that the critical portion of that prosecution history was misquoted by Affymetrix to the district court below in its reply brief. In particular, Affymetrix told the district court that the inventors had distinguished the prior argument based on the use of so-called random primers rather than random primers. What's the difference between random priming and random primers? A random primer is a primer that has random nucleotides in it. Random priming is where your primer. So you agree that randomly primed means that the primer is random nucleotide? Random primer. If that had been the words, that would have been the words. But random primer means that the nucleotides in the primer are random, right? If you said random primer, I agree. I may have misheard you. In any case, unfortunately, we had a three-year delay between when the Markman case was argued and when the district court issued his opinion. When he went back, he simply picked up this random primer composition concept and wrote that as a claim limitation into the claims. In summary, we think the district court's extraneous random primer limitation is wrong as a matter of law. It ignores, and he never mentioned or even addressed the inventor's express definition that was incorporated into the claim language. It is contrary to the specification of the prosecution district because there are four embodiments, two of which do not use random primers. It improperly excludes all of the IRS examples. It eliminates the entire adapter PCR embodiment and it nullifies the corresponding dependent claims related thereto. For all those reasons, we think the district court's construction cannot be correct. It should be reversed and we urge the court to adopt the structural definition that we prepared for the district court to summarize and simplify the language that appears at column 12, line 45. Thank you, Mr. Weiss. Sounds like you'd like to save the rest of your time. I would, Your Honor, and with respect to the remaining issues, I would respectfully refer the court to our briefs and save the rest of my time for rebuttal. Thank you. Mr. Root. Good afternoon. May I please the court? Peter Root for Appellee's Affymetrics and Navigenics. I'd like to make a few points this afternoon. First, the claim construction in this case is straightforward. It is undisputed that PCR-derived modifies RCG and that a PCR-derived RCG is simply an RCG that has been generated by a PCR method, any PCR method. During prosecution, the examiner said, wait a second, there is already a lander reference that does PCR and also uses an ASO SNP to detect single nucleotide polymorphisms, covers your claim, anticipates your claim. The applicant then said, no, no, no, lander needs to know the target in advance in order to select appropriate primers. We don't do that. We do random priming. They added the word randomly primed before PCR-derived. It's clear from the claim language that randomly primed modifies PCR and then PCR-derived modifies RCG. There's no issue of being one's own lexicographer? There is no issue at all. There's argument, obviously, that was raised that the inventors acted as their own lexicographers, but they did not do that in the specification. Your expert said they did. Dr. Kwok was responding in interference, which, by the way, was two years after this patent issue, but he was responding in the interference to the position taken by MIT that there was a definition at column 12 in the specification. Right, and he said there was. He said there was, essentially accepting their position. He can say that at the PTO, but when it comes to this case, you're not bound by that? No, I don't think we are bound by it, Your Honor, but let me just say why. I think that what Dr. Kwok was doing was accepting their position. It was clear that he was basically saying, and I'll find it in a second if need be, but if correct, if it is correct that they have a definition, we still cover their claim. The Sapolsky application, the Affermetrix application still covers their claim. So he's saying if Landers, with the S, he's the lead inventor on that 228 patent, if Landers is correct that there's that definition, we still cover it. But he was clear in saying that one of ordinary skill in the art of reading this would assume that the randomly-primed PCR is using degenerate nucleotides, which are randomly-selected nucleotides. Dr. Kwok said specifically that Landers defines a randomly-primed PCR-derived RCG as a population of fragments that share common sequences at or near the 5' and 3' ends. So if that's what he said, and that's the definition, why isn't that what we should be operating from? Well, that is the position that MIT took. There was only a part of the interference that was put into record and was put in claim construction in E8 MIT's reply brief. So we didn't have the opportunity to put in more of the record. But we did put in a slide during the claim construction hearing. It's A2410. And on that slide, we quote some of what MIT had put into their September 2006 filing in the interference. And one of them is that randomly-primed PCR, excuse me, randomly-primed means that the fragments, quote,  and 3' ends of the fragment. So Dr. Kwok was responding to that. And he did say in his declaration... That would be true, would it not, even if the nucleotides were randomly selected? It would be true if you're using a single primer, that you would have the same primer. Of course, if you're using a single primer, you're putting your primer into the mixture. That primer is the only primer in there. It's the one that's going to match head-to-head. And of course, where the primers match head-to-head, are going to define the ends of your amplified fragments. Of course, any PCR that uses a single primer. So there's identity even if the initial selection is random? That's true. Even if the initial selection is random, as long as you're using the same sequence, random sequence in your primer, you're going to get the common ends. Because again, only one primer. The definition does not work at all when you use more than one primer. And the specification, of course, talks in spades about the use of more than one primer. Column 12, which reportedly contains the definition that plaintiffs want to use, says right there that more than one primer can be used to generate the RCG. And if you use more than one primer, you're going to not have common ends at all the fragments in the RCG. You're going to have different sets of ends in the RCG. Some that have the same primer and others that have different combinations. So where is this expert testimony? This expert testimony is... What page of the appendix? The expert testimony is at a couple pages. One is at page A1645. And in paragraph 25, this is Dr. Clark's initial declaration, October 13, 2006, responding to the September 2006 position taken by MIT. And he states... When he uses the phrase degenerate nucleotide, is that interchangeable with arbitrarily selected? I mean, what is that? A degenerate nucleotide is... Where you... For any position in the sequence, you pick all of the nucleotides. So in other words, if you're going to have a sequence where you're going to have one of the ends, any nucleotide, N stands for any nucleotide, it's going to be an A, another one's going to be a T, another one's going to be a G, another one's going to be C. So you're going to have four primers just to cover all of the four bases. But a degenerate is you're just using all of those bases and what the specification talks about in the 228 is using up to nine degenerate nucleotides, in which case you'd have over 220,000 unique primers because you're putting in every possible combination of the nine bases. Okay. I'm sorry to take you out of... Why don't you go back to where you were? Sure. So page A1645, paragraph 24, he states... At the time the Sapolsky application was filed, which was filed before the 228 patent was filed, patent application was filed. At the time the Sapolsky application was filed, one of skill in the art would have understood randomly primed PCR to refer to a PCR process in which the sequence of nucleotides in the primer contained at least one degenerate nucleotide and preferably a number of degenerate nucleotides. The Landers patent, however, defines randomly primed PCR in a way that differs from that understood by one of skill in the art. Can you describe to where that is? So if I understand correctly, he's not addressing the supposed definition that appears in column 12 of the patent. He's referring to another part in 18 where he's saying that if you use one of these methods, you're not using randomly primed. Right. That's right. He's not addressing the column 12. He's not addressing column 12. He's not saying that column 12 has a definition and you don't disagree, well, maybe you do disagree, but the specification appears to include examples of methods that don't involve random priming which may have been surrendered by the claim amendment during the prosecution. You're absolutely right, Judge. That's where the plaintiffs go off the rails is they're trying to say, well, there's a definition and it covers all the embodiments. They surrendered everything that did not involve random priming which includes, let's do it backwards. Let's talk about what they did include. Random priming using random primers with at least one or more than one, not degenerate, but degenerate or arbitrarily selected nucleotide. So that covers their preferred embodiment of degenerate oligonucleotide primed PCR. It includes arbitrarily primed PCR, that one other embodiment, it includes multiple primed PCR. It includes all three of those entirely. Those only use random primers. It also includes interspersed repeat sequence or IRS PCR because in IRS PCR, what the patent teaches is you can diverge from the consensus IRS PCR sequence, the repeat sequence. There's a consensus sequence that was out there at the time this patent was filed. If you want to do random PCR, random primers, you diverge from that consensus sequence by picking one or more nucleotides in your primer. They say in general, that's what you're going to do. They say in general, you're going to have your primer diverge from the consensus sequence by up to 50%. I'll point to that. That's right at column 16, line about 53. It says in general, an IRS PCR primer has a sequence wherein at least a portion of the primer is homologous with e.g. 50%, 75%, 90%, 95% or more identical to the consensus nucleotide sequences of an IRS subject. They're saying diverge, only you can use up to 50% arbitrarily selected nucleotides. That's the random way of doing interspersed repeat sequence PCR. For adapter PCR, if we go to page 17 of the appellant's reply brief, we heard Mr. Weiss say we've written out entirely of the district court with its construction has written out entirely IRS PCR to show that's not true at all. With adapter PCR, you can either do it in a non-random way or you can do it in a random way. You can do it in a random way if you look at page 17 of their reply brief. They show that if you use a certain enzyme, it's going to cut the genome and the fragment's going to have a random overhang of three bases where it could be any of the four bases. What you do is you attach an adapter to that, adapter linker, which is going to include arbitrarily selected nucleotides in those three random overhang positions. You randomly pick those and then you ligate or chemically attach your adapter onto the demonstrated fragment. When you go to your PCR step, you melt those two fragments apart and you can do what they're showing here in a non-random fashion. This is in step four on page 17 of the reply brief. They show just using a primer that attaches to one part of the adapter. But if you used the entire top part of that adapter as your primer, which is perfectly reasonable to do, you're going to be including those three nucleotides. Hence, including in your primer randomly selected nucleotides. Then there is also a further way of doing adapter PCR using random priming, which was described in the art. It's the McCaskey-Fiesel patent, which is listed in the 228 patent and was described to the district court in the tutorial. We walked him through that. The slides that we used to walk the district court through that start at A2057. We show there the McCaskey-Fiesel patent where it's cited in the 228 patent. Then at page 2065 is where at the end we show where you have your adapter and then you're just adding one or two or three. Here it's showing adding one additional arbitrarily selected nucleotide. The McCaskey-Fiesel patent in prior arts of the 228 was teaching you can use random primers arbitrarily selected nucleotides of three that attach to the adapter but were not part of the adapter. Just made part of the primer. I have just a few seconds left and one of the points I'd like to make is that the examiner who was also representative of a person skilled in the art obviously understood randomly primed to mean randomly primed PCR and he said as much in his second rejection where he said we understand Lander doesn't do randomly primed PCR as is required in the instantly amended claims and it's clear he understood PCR randomly primed to referring to the PCR and specifically referring to the primers. Thank you Mr. Root Mr. Weiss has a little rebuttal time Yes your honor I'd just like to make a few quick points number one the clock declaration is quoted at page 41 of our blue brief in full it is clear it is unequivocal it says there's a special definition it is a devastating admission Does it address column 12? Yes it cites exactly column 12 Where does it say that? On page 41 of the blue brief he cites exactly the column he says quote the 228 patent defines the randomly primed PCR derived RCG as a population of fragments that share the common sequences at or near the ends he then cites to the patent column 12 lines 45 to 48 it could not be clearer and with respect to the question I'm sorry if it was clear about that it says common sequences would be obtained by using one primer or a set of primer having common sequences that could still be having common sequences a set of primers having common sequences could still have randomly chosen nucleotides right? Primer whether they have randomly primed or don't they will all generate this structure of fragments right but my statement is correct is it not? that even if they have common sequences when you get done with it in the selection process if they're randomly selected they're randomly primed no if they're precisely defined they contain no arbitrary nucleotides such as an IRS an adapter but that's not what I said the fact that when you are using them they have common sequences because you've replicated them they could still be randomly primed randomly selected initially it covers both they could be precisely defined or not that has nothing to do with the invention I guess that's one of the big points we keep coming back to because if the composition of the primer was important you would have thought that during the prosecution history either the in the specification you would have thought you would have seen a statement that says to make this invention work you need random nucleotides in the primer you don't get that in fact you get just the opposite you get the teaching of four different embodiments two of which do not use any random nucleotides in terms of one thing I want to finish up on the clock declaration and the fact that there is a special definition in the patent because if we do that we are entitled to the full scope and meaning of that there has been no surrender of claim scope and again I would point you to Affymetrix most recent rule 28 letter where they specifically state we are not relying on a disclaimer or a claim scope so if you agree with us that there is a definition that the special definition as I said five times in the prosecution history has been adopted into the claims we are entitled to the full scope of that covering all of the embodiments including the IRS and the adapter PC do you agree with your opinion on the patent the randomness that talked in the patent refers to the enzyme you use an enzyme to cut up the DNA molecule the enzyme produces random overhangs which you then put on adapters the adapter has on it a primer sequence that is precisely defined you know as their counsel said to the PTO and the interference you know what the sequence is because you are the one who put it on in the first place so the randomness relates to the enzyme cutting the molecule it does not relate to the sequence of the primer as taught in the patent all of our patent picks up prior art references none of which ever used any kind of random primers for the adapter PCR embodiment thank you Mr. Weiss we'll take the case under advisement thank you your honor all rise the honor goes to Judge Balmoy at 10 a.m. thank              honor I would like to present the case of Judge Balmoy at 10 a.m. thank you your honor Judge Balmoy at